
# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 26, 2017 Session

## DEADRICK GARRETT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 99056    G. Scott Green, Judge**

_____

## No. E2016-01519-CCA-R3-PC
_____

Deadrick Garrett ("the Petitioner") appeals the Knox County Criminal Court's denial of post-conviction relief from his conviction for first-degree premeditated murder and resulting life sentence. On appeal, the Petitioner argues that he received ineffective assistance of counsel based on trial counsel's failure to: (1) communicate with the Petitioner and adequately explain criminal and trial procedure; (2) review discovery with the Petitioner, including witness statements and forensic evidence; (3) have the Petitioner evaluated by a mental health expert and pursue a diminished capacity theory of defense; (4) anticipate that the trial court would deny a self-defense jury instruction and develop a viable alternative defense; and (5) object to the Petitioner's demonstrating on cross-examination that he could open the knife used in the murder with one hand. The Petitioner further asserts that trial counsel improperly: (6) advised a defense witness to be hostile towards the victim; (7) instructed the Petitioner to "cry on cue"; and (8) fabricated the Petitioner's trial testimony "so as to create some justification for [the Petitioner's] stabbing [the victim]." After a thorough review of the appellate record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Forrest L. Wallace, Knoxville, Tennessee, for the appellant, Deadrick Garrett.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Charme Allen, District Attorney General; and Leland Price, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural Background

*Trial*

After a jury trial, the Petitioner was convicted of first-degree premeditated murder in the stabbing death of his half-brother, Rashad Miller, and was sentenced to life imprisonment. On direct appeal, this court summarized the facts presented at trial as follows:

> At trial, the nephew of both the [Petitioner] and victim testified that he lived with the victim at the time of the killing. He recalled that on the July 22, 2007, he woke up to a knock on the front door. He answered the door, and the [Petitioner] asked if the victim was at home. The nephew told the [Petitioner] he was not sure, but he could check. He did not recall seeing the [Petitioner] with a weapon and described the [Petitioner] as "calm." The nephew heard the [Petitioner] knock on the victim's door and heard the victim ask "who's there?" The nephew returned to his bedroom, shut the door, and turned on the television. About two minutes later, he heard a loud "boom" and what sounded like "tusslin'" or "wrestlin'" in the victim's bedroom. He heard the victim's door slam and heard the [Petitioner] talking loudly as he walked out of the apartment. The victim called the nephew's name, but the nephew could not enter the bedroom because the door was jammed. He had to "barge in" and found the victim on his knees behind the door. The nephew asked his girlfriend to call the police while he stayed with the victim. The victim could not stand and struggled to breathe. The nephew witnessed the victim take his last breath. He observed a hole in the sheet rock that he believed was the result of the loud "boom."

> An evidence technician of the Knoxville Police Department Forensic Unit testified that she responded to the crime scene. She observed a gouge mark on the exterior of the bedroom door that was consistent with someone holding a knife against the door from the outside. The furniture in the bedroom did not appear to have been disturbed. The only sign of a struggle was a large hole in the drywall behind the bedroom door. She opined that the bloodstains on the interior of the bedroom door were consistent with blood being thrown from a knife. She explained that the blood appeared to have hit the door and run down. There was also blood on the bed that appeared to have been flung. The victim's tee shirt remained in the

- 2 -

bedroom and was saturated with blood. A broken piece of metal was found behind the bedroom door, and a knife was later recovered in a wooded area. The back portion of the knife had been broken off and was consistent with the piece found in the victim's bedroom.

The [Petitioner] executed a written waiver of his rights and gave a recorded statement. The [Petitioner] told police that his twelve-year-old sister had informed their family that the victim, who was their half-brother, had raped her on the Friday before the crime. The [Petitioner] said his mother called him at work to tell him what had happened. He told police that he "just lost it" when his sister told him about the rape. The police asked if the [Petitioner] was concerned that the victim would have a gun, to which the [Petitioner] responded that he was angry and felt "bullet proof." The [Petitioner] told police that they fought and crashed into the wall before falling to the floor. He said the victim jumped on top of him and told him to calm down. The [Petitioner] told police that he was frightened and that he began "sticking [the victim] in the stomach" with a stick. He denied using a knife. The [Petitioner] told police that killing the victim was in his mind when he went to confront him and that he went to the apartment with the intention of hurting the victim. The [Petitioner] turned himself in to police after attempting to conceal the weapon and shirt he was wearing during the crime.

The doctor who performed the autopsy testified that the victim died of multiple stab wounds, which totaled fourteen. The wounds were consistent with the victim and attacker facing each other. The victim also had wounds to his back consistent with moving away from his attacker.

The [Petitioner's] sister testified that she was twelve years old in July 2007, and that she told her mother and the [Petitioner] that she had been raped by the victim. She testified that she, the victim, and the [Petitioner] had the same father. She recalled that her father was mad that she told her mother what had happened. She told the [Petitioner] what happened on the phone and recalled that he was mad. Even though she told the [Petitioner] that their father did not want to report the rape, the [Petitioner] insisted she go to the hospital and report the rape.

The [Petitioner's] mother recalled that the [Petitioner] was upset and angry and that he cried when he was told about the rape. She also testified that the [Petitioner] might have said that he stabbed the victim.

The [Petitioner] testified that two days after he learned of the rape, he went to see the victim and took a weapon. He said he took the knife because he was afraid of the victim. He testified that he punched the victim in the head after the victim made crude statements about their sister. He said that they struggled and that the victim got on top of him. He acknowledged stabbing the victim and then running from the room. He went to the home of friends and asked them to wash his shirt and dispose of the knife. He acknowledged that he only surrendered after attempting to destroy evidence.

*State v. Deadrick Garrett*, No. E2009-02365-CCA-R3-CD, 2011 WL 486846, at *2-3 (Tenn. Crim. App. Feb. 11, 2011), *perm. app. denied* (Tenn. July 15, 2011). This court affirmed the judgment of the trial court on direct appeal, and the Tennessee Supreme Court denied the Petitioner's application for further review.

*Post-Conviction Proceedings*

The Petitioner filed a timely, pro se petition for post-conviction relief, asserting that he was denied the effective assistance of counsel. Following the appointment of counsel, the Petitioner filed an amended petition.

At an evidentiary hearing, Leslie Nassios, an Assistant District Attorney with the Knox County District Attorney General's Office, testified that she had been employed with the office since 2002 and that she primarily handled violent felony offenses. Ms. Nassios stated that she had tried eight murder cases with the Petitioner's trial counsel before trial counsel's death.[1] She explained that, in her professional experience working with trial counsel, trial counsel "had a lot of zeal for his work" and "really enjoyed being a defense lawyer." Ms. Nassios recalled:

I know that [trial counsel] spent a lot of time with his clients. He was always at the courthouse. He was frequently working late at the jail when inmates were housed here. I know he was at the detention facility a lot.

Ms. Nassios stated that she and trial counsel discussed cases frequently, "even cases that [they] didn't have in common" and that trial counsel "liked to talk about his work."

Ms. Nassios testified that she discussed the Petitioner's case with trial counsel often and that trial counsel considered the murder charge "a defensible case at least in

---

[1] While the instant petition was pending before the post-conviction court, the Petitioner's trial counsel died as the result of a motor vehicle accident.

- 4 -

terms of . . . the level of homicide" because of the allegation that the victim had sexually molested the Petitioner's sister. Upon her review of the case, however, Ms. Nassios believed that the proof "strongly supported" the charge of first-degree premeditated murder, and she informed trial counsel that she would not make an offer to reduce the charge. Additionally, Ms. Nassios explained that, while out on bond in the instant case, the Petitioner murdered someone else.[2] She stated that because of this additional murder she did not make any offer to settle the Petitioner's case; rather, she intended to take both cases to trial. Ms. Nassios stated that the Petitioner's options were to enter an open guilty plea to the charged offense or proceed to trial.

Ms. Nassios recalled that trial counsel made a formal request for discovery, and she agreed that trial counsel filed multiple motions on the Petitioner's behalf, which were litigated before trial. Regarding the facts of the case, Ms. Nassios recalled that the Petitioner fled the scene of the murder but eventually turned himself in. She stated that based on the police investigation:

> . . . there was no doubt it was [the Petitioner]. There were witnesses at the scene who could put [the Petitioner] there at the time of the murder. And then there was no doubt because of information -- all the family knew what had happened with respect to [the Petitioner's] sister and [the victim].
>
> . . . .
>
> We knew from -- we knew that [the Petitioner's] mother was afraid for [the Petitioner] to encounter [the victim]. She was afraid of what [the Petitioner] might do. She knew he was angry. We had information that [the victim] was afraid of [the Petitioner], even though he was older and bigger. We learned through investigation that there was a lot of animosity between the [half] brothers because their father . . . unfairly favored [the victim] and [the victim] was more spoiled.
>
> . . . .
>
> [T]here were witnesses at the scene, a man named James Harris, I believe his girlfriend, [the Petitioner's] own statement, [the victim] was stabbed [twenty-five] times. Well, he had [twenty-five] wounds, [fourteen] were stab wounds, [eleven] slash type wounds. The blood spatter evidence was almost all concentrated in the area of the doorway of the bedroom --

---

[2] *See State v. Deadrick Eugene Garrett*, No. E2010-00954-CCA-R3-CD, 2011 WL 287355, at *1 (Tenn. Crim. App. Jan. 24, 2011), *perm. app. denied* (Tenn. May 25, 2011).

- 5 -

the room where [the victim] was killed. [The victim] had no defensive wounds on his body. There was every reason to conclude from the investigation that he didn't expect [the Petitioner] at that time, that he was kind of taken by surprise. The attack happened very quickly. It contradicted [the Petitioner's] -- the physical evidence contradicted [the Petitioner's] statement.

According to Ms. Nassios, the State's witnesses testified credibly at trial. She stated that the evidence showed that the Petitioner went to the victim's house with "a very ugly looking weapon" and that the fact that there were no defensive wounds was "extremely damaging" to [the Petitioner's] argument that he and the victim had been in a fight.

She explained that, through cross-examination of the State's witnesses, trial counsel attempted to show that there had been a "scuffle" between the victim and the Petitioner and that the Petitioner had acted in self-defense. Ms. Nassios stated that trial counsel was also "go[ing] for manslaughter." Trial counsel called several of the Petitioner's family members as witnesses, and the Petitioner testified in his own defense. Ms. Nassios recalled that the Petitioner's mother corroborated the Petitioner's sister's allegation of sexual abuse, which had been "a very upsetting and terrible thing for their family to go through." Regarding the Petitioner's trial testimony, Ms. Nassios stated, "There may have been points where he got emotional, but I remember him being very collected and very cool, and polite, courteous." She further stated that it appeared that trial counsel had prepared the Petitioner for his testimony.

Ms. Nassios testified that the murder weapon was a knife that was "connected to brass knuckles[.]" She stated that, during her cross-examination of the Petitioner, she asked the Petitioner to open the knife. Ms. Nassios explained:

> I think that [the Petitioner] said that [the knife] wasn't open when he went into the room, and I wanted to be able to establish that you just couldn't like flip this thing open, especially in the heat of a physical altercation. And so I handed him the knife and asked him to show us how it happened.

She did not recall, however, whether the Petitioner was able to open the knife with one hand. Ms. Nassios agreed that, during the charge conference, she argued against a self-defense jury instruction.

Ms. Nassios stated that she had worked as a criminal defense attorney for many years before her employment with the district attorney's office and that she had defended "many, many homicide cases." She believed that trial counsel was an effective defense

attorney; she testified that he was known for "being the kind of lawyer who could communicate well with difficult clients, difficult defendants . . . people who are facing really serious charges and . . . judges throughout the courthouse and in other counties appointed [trial counsel] in a number of high profile cases."

Ms. Nassios stated that, in her discussions with trial counsel regarding the Petitioner's case, trial counsel was familiar with the facts, had developed a trial strategy, and was ready for trial. Regarding the defense strategy, Ms. Nassios explained:

> . . . I think any attorney who's practiced any length of time knows that there are certain things that you can expect -- there's certain ways to define a typical voluntary manslaughter case, and I think that it was a perfectly -- I think that's what [trial counsel] was going for, and you can call it self[-]defense. I mean, he -- but essentially that's what [trial counsel] was shooting for, that was his goal[.]

Ms. Nassios stated that trial counsel's strategy was reasonable under the facts of the case.

The Petitioner's mother, Joanna Isom, testified that the Petitioner had no learning disabilities, "literacy issues," or mental health issues as a child. She explained that the Petitioner had three children, one of which he fathered while in high school, and that upon graduating the Petitioner began working and "got his own place[.]" Ms. Isom recalled that, after the Petitioner made bond in this case, she and other family members went to trial counsel's office for witness interviews. Ms. Isom recalled that, at the meeting, trial counsel asked her if she liked the victim. According to Ms. Isom, when she responded that "in the beginning he was okay[,]" trial counsel said, "[Y]ou can't like him. If we go to court and I put you up there, you can't like him." Ms. Isom recalled that trial counsel interviewed the other family members and spoke with the Petitioner during this meeting. Ms. Isom testified that trial counsel was "mad" when the Petitioner was arrested on a second murder charge while he was out on bond. Ms. Isom recalled that she remained in the courtroom after her testimony to watch the Petitioner testify. She stated that the jury returned its guilty verdict quickly and that, afterwards, she visited the Petitioner at the jail. When asked if the Petitioner expressed any concerns about the case during the visit, Ms. Isom responded, "He wanted -- he knew what he was doing. He wanted to do that. And that's about it."

The Petitioner testified that he could read and write and that he had graduated from high school in 2007. He stated that he had four children with his ex-girlfriend, Beverly Spears. Regarding the victim, the Petitioner recalled that the victim was "spoiled" by their father and "got what he wanted when he wanted it." He stated that,

around the time he graduated from high school, the victim got out of prison. The Petitioner stated that the victim was "real aggressive" towards him.

Regarding the events leading up to the victim's murder, the Petitioner stated that he was "shocked" when Ms. Isom told him about the victim's sexual abuse of the Petitioner's sister. The Petitioner recalled that after speaking to Ms. Isom, he left work a few hours later, and went to his mother's house thinking that the victim would return to that location. The Petitioner was angry and "ready to fight." When the victim did not return to Ms. Isom's house, the Petitioner went home and went to sleep. Two days later, the Petitioner received a phone call from James Harris, who lived with the victim, and then left the house, despite Ms. Spears' attempting to stop him. The Petitioner acknowledged that he armed himself with a knife and went to the victim's apartment. He recalled Mr. Harris telling him to "talk it out" with the victim, and Mr. Harris gave the Petitioner a small bag of marijuana. The Petitioner stated that he knocked on the victim's door but denied that he scraped the outside of the door with the knife. The Petitioner said that, once the victim opened the door, he went into the victim's bedroom. He asked the victim, "[W]hy did he do that to [the Petitioner's sister?]" The Petitioner testified that the victim turned his back to him and did not answer. The Petitioner stated that he then "blacked out," and when he "came to" he was on top of the victim and the victim "was telling [the Petitioner] he was dying." The Petitioner said that he told Mr. Harris to call an ambulance as he left the residence. He then went to a friend's house for help "to get rid of the weapon" but that he eventually turned himself in to police.

The Petitioner stated that trial counsel was appointed to represent him in general sessions court. The Petitioner made bond on the charge several months later but was taken back into custody after the second murder. The Petitioner recalled that trial counsel was upset with him over the second murder because counsel "knew that it would hurt the first case." He described that, afterwards, trial counsel did not have any confidence in the Petitioner's case and "lost interest" in it. The Petitioner agreed, however, that trial counsel visited "a lot" while he was in jail and that, about a week before trial, trial counsel was there "every day of the week." The Petitioner also agreed that trial counsel had a private investigator who worked on the case. The Petitioner could not recall whether trial counsel went over discovery with him, but he stated that he understood the case. The Petitioner also stated that trial counsel explained to him the trial process, but the Petitioner "wasn't really . . . paying attention." According to the Petitioner, trial counsel told the Petitioner to act a certain way, stay focused, and listen. Trial counsel focused on the Petitioner's testimony, through which the defense could establish that the victim had been "aggressive." The Petitioner acknowledged that trial counsel explained the defense strategy but said that trial counsel's main concern was "to make sure [the Petitioner] pull[ed] this off on the stand, the testimony."

The Petitioner explained that it was important to his self-defense claim that he was able to open the knife used in the murder with one hand but that trial counsel did not believe that the Petitioner would have to open the knife during trial. The Petitioner explained, however, that the prosecutor asked him to demonstrate, during cross-examination, how he had opened the knife. During the demonstration, the Petitioner was able to open the knife with one hand only because "[his] nails had been long."

The Petitioner stated that he was depressed while in custody, and he did not receive any mental health treatment. The Petitioner stated that he asked trial counsel about having a mental health evaluation. The following exchange then took place:

> [THE PETITIONER]: [Trial counsel] said he didn't see nothing [sic] wrong with me, I just had an anger problem.
>
> [POST-CONVICTION COUNSEL]: What was your reaction to that?
>
> [THE PETITIONER]: I agreed because, I mean, I always thought there wasn't nothing wrong with me, but, you know, a lot of people around me say I've got some type of paranoia going on with me and things of that sort.

The Petitioner stated that he had a fear of upsetting trial counsel because he knew trial counsel was a good attorney. According to the Petitioner, trial counsel instructed him to "cry on cue" during his testimony and that he "needed to convince the jury that it was true." When asked what had been his cue to cry, the Petitioner stated, "Well, when my -- when [the victim] said what he was supposed to have said and made me do what I -- or do what I did." However, the Petitioner admitted that the victim did not say anything to him. According to the Petitioner, trial counsel advised that the Petitioner's testimony would "sound better" if the Petitioner testified that the victim said crude things about the Petitioner's sister. When asked about what he thought of trial counsel's advice, the Petitioner stated, "Well, I felt like . . . maybe we can pull it off." The following exchange then occurred:

> [POST-CONVICTION COUNSEL]: So that line, that cue was just a fabrication that [trial counsel] came up with?
>
> [THE PETITIONER]: Yeah.
>
> [POST-CONVICTION COUNSEL]: And he felt it would be important to your testimony?

[THE PETITIONER]: Uh-huh.  Yeah.

[POST-CONVICTION COUNSEL]: Number one to cause you to have reacted to [the victim] the way you did, right?

[THE PETITIONER]: Right.

[POST-CONVICTION COUNSEL]: And number two, also to cause you to be emotional --

[THE PETITIONER]: Right.

[POST-CONVICTION COUNSEL]: -- while you're testifying, right?  That was why it was called a cue?

[THE PETITIONER]: Yeah.

[POST-CONVICTION COUNSEL]: So you felt guilty about going along with this?

[THE PETITIONER]: Yeah.  Yeah, I felt real guilty.

[POST-CONVICTION COUNSEL]: But you did it anyway?

[THE PETITIONER]: I did [it] anyway.

The Petitioner testified that trial counsel concocted the story about how the victim "was aggressive" and "got on top of [the Petitioner]."  The Petitioner acknowledged that he testified to that story but stated that "none of that happened."  The Petitioner stated that, if he had testified truthfully at trial, he would have said that the victim never said anything to him but that the Petitioner "went into a rage," pulled out his knife, and attacked the victim.

The Petitioner testified that he was able to ask trial counsel questions during trial and that counsel kept him informed about the trial's status.  The Petitioner recalled that, following his conviction, trial counsel handled the direct appeal before withdrawing from the case.  Trial counsel provided the Petitioner with a copy of the appellate brief and court opinion, and he told the Petitioner that he had one year to file a petition for post-conviction relief.

Following the hearing, the post-conviction court denied the Petitioner's request for post-conviction relief. The post-conviction court ruled:

> This Court accredits the testimony of [Ms.] Nassios that the Petitioner's trial counsel vigorously defended him. Moreover, this Court finds that [trial counsel's] strategy of attempting to focus the jury's attention upon the allegation against the victim was the only viable trial strategy in this case. The [P]etitioner's present attempt to shift the responsibility for his testimony to his attorney is misplaced. First and foremost, [trial counsel] is not alive to refute the allegations made by this [P]etitioner. Secondly, even if these allegations are true, a post-conviction court may not second guess trial strategy or tactics, nor may a defendant who admittedly committed perjury thereafter seek to escape his culpability for same by blaming it on his attorney . . . .
>
> Most significantly, however, the Petitioner failed to prove any prejudice resulting from any alleged ineffective assistance of counsel provided by his attorney. The evidence supporting the guilt of th[e] [P]etitioner's conviction for first degree murder is overwhelming. By the [P]etitioner's own admission he sought out [the victim], armed himself with a knife, attacked an unarmed man, brutally stabbed/cut [the] victim some twenty-five times, and thereafter fled the scene. There is nothing this Court has heard, nor read within this record, which would make it question as unreliable the viability of the first degree murder conviction which precipitated this post-conviction proceeding.

This timely appeal follows.

## II. Analysis

### A. Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State,* 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally,

"questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

### B. Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

### 1. Failure to properly communicate and explain criminal and trial procedure

The Petitioner contends that trial counsel failed to properly communicate with the Petitioner throughout the proceedings. He asserts that trial counsel "did not spend time explaining criminal procedure and trial procedure" and that trial counsel instead focused on preparing the Petitioner to testify at trial.

At the post-conviction hearing, the Petitioner testified that trial counsel visited him "a lot" while he was in jail and that, about a week before trial, trial counsel was there "every day of the week." The Petitioner acknowledged that he and trial counsel discussed trial strategy and the defense theory and that trial counsel focused on preparing the Petitioner to testify so that the defense could establish that the victim had been "aggressive." The Petitioner testified that he was able to ask trial counsel questions during trial and that counsel kept him informed about the trial's status. Moreover, the Petitioner stated that trial counsel explained the trial process but stated that he "wasn't really . . . paying attention." Following the Petitioner's conviction, trial counsel handled the direct appeal before withdrawing from the case. Trial counsel provided the Petitioner with a copy of the appellate brief and court opinion, and he told the Petitioner that he had one year to file a petition for post-conviction relief. Thus, the testimony at the post-conviction hearing contradicts the Petitioner's claim that trial counsel was deficient in failing to communicate with the Petitioner and explain the trial process. Moreover, the Petitioner has not established that the result of the proceeding would have been different had trial counsel had additional communication with the Petitioner or further explained criminal and trial procedure. This issue is without merit.

### 2. Failure to review discovery with the Petitioner

The Petitioner asserts that trial counsel's performance was deficient because trial counsel did not review discovery with the Petitioner prior to trial. When asked about this issue at the post-conviction hearing, the Petitioner could not recall whether trial counsel went over discovery with him, but he stated that he understood the case. In his brief, the Petitioner has failed to explain how trial counsel's alleged failure to go over discovery with the Petitioner prejudiced his defense. Accordingly, the Petitioner has failed to establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Goad*, 938 S.W.2d at 370. The Petitioner is not entitled to relief on this claim.

*3. Failure to obtain a mental evaluation for the Petitioner and pursue a diminished capacity theory of defense*

The Petitioner next asserts that trial counsel should have had the Petitioner evaluated by a mental health expert to determine whether the Petitioner "was laboring from any diminished capacity on the date of offense." He contends that trial counsel should have presented a diminished capacity theory of defense through the testimony of an expert, "to negate the existence of the culpable mental state necessary to convict the [Petitioner] of premeditated murder."

"When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Otherwise, the petitioner is asking the court to "speculate or guess . . . on what a witness's testimony might have been if introduced by defense counsel." *Id.* A petitioner cannot establish that his trial counsel's failure to call the witness prejudiced his defense if the petitioner does not present the witness at the evidentiary hearing. *Id.* at 757-58. A petitioner must present medical proof of his diminished capacity during his evidentiary hearing to show that trial counsel's failure to obtain a mental health evaluation was prejudicial. *Anita Kay Broughton v. State*, No. E2013-00790-CCA-R3-PC, 2013 WL 6199302, at *20-21 (Tenn. Crim. App. Nov. 27, 2013) (citing *Black*, 794 S.W.2d at 757), *perm. app. denied* (Tenn. May 15, 2014).

At the post-conviction hearing, the Petitioner testified that he asked trial counsel about having a mental health evaluation, but trial counsel responded that he did not see anything wrong with the Petitioner. The Petitioner testified that he agreed with trial counsel's assessment that he had anger problems but that, otherwise, there was "nothing wrong with [him]." The Petitioner did not present witnesses or other medical proof to establish his diminished capacity, and we cannot speculate on what the results of a mental health evaluation would have been. The Petitioner has failed to establish deficient performance and resulting prejudice.

*4. Failure to anticipate that the trial court would deny a self-defense jury instruction*

At the conclusion of proof at trial, the trial court found that the evidence presented did not support a self-defense jury instruction. The trial court reasoned:

> [The Petitioner] has testified that--in his statement and on the witness stand that he went over with a knife. That he was . . . basically was the first aggressor--and that takes it out of self-defense--and hit [the victim] in the very beginning on the forehead. And I think he went over that pretty

- 14 -

clearly that that's what he testified to. And then from the rest of the proof there seems no evidence that the Court can find that at any point [the Petitioner] felt he was acting in self-defense. The only thing that he has said that he now says is true is that [the victim] was on top of him and he had to get him off of him. But [the victim] had no defense wounds. [The Petitioner] had no apparent wounds. And even though they might have tussled that does not create self-defense, even though they might have fought. It may create some inferences with respect to what level of -- of offense there is or acquittal. I don't know. But I don't think it rises to self-defense so I'm not going to charge self-defense.

On appeal, the Petitioner asserts that trial counsel was ineffective for failing to prepare a viable alternative defense in anticipation that the trial court would deny a self-defense jury instruction. Contrary to the Petitioner's assertion, Ms. Nassios, whose testimony the post-conviction court credited, testified that trial counsel employed a defense strategy that included arguing for a conviction on the lesser-included offense of voluntary manslaughter based on the emotionally-charged allegation of the sexual assault of the Petitioner's sister by the victim. Ms. Nassios stated that trial counsel's strategy was reasonable under the facts of the case, and the post-conviction court agreed, finding that trial counsel's strategy of "attempting to focus the jury's attention upon the allegation against the victim was the only viable trial strategy in this case." We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson*, 197 S.W.3d at 790. This issue is without merit.

*5. Failure to object to the Petitioner's opening of the knife during cross-examination*

The Petitioner next contends that trial counsel was ineffective for engaging in a "high stakes gamble" during trial by allowing the Petitioner to demonstrate during the State's cross-examination that he could open the knife with one hand. At the post-conviction hearing, the Petitioner testified that trial counsel did not believe that the Petitioner would have to open the knife at trial. Nevertheless, during cross-examination, Ms. Nassios asked the Petitioner to open the knife, and trial counsel did not object. The Petitioner stated that he was able to open the knife with one hand because "[his] nails had been long." Thus, the Petitioner has failed to establish any prejudice resulting from trial counsel's failure to object to this demonstration. The Petitioner's demonstration supported his claim that he pulled out the knife in the heat of an altercation with the victim while the victim was on top of him. Accordingly, the Petitioner is not entitled to relief based on this claim.

### 6. Improperly advised Ms. Isom to be hostile towards the victim

The Petitioner contends that trial counsel improperly advised Ms. Isom to testify that she had never liked the victim, which was contrary to her experience with the victim. At the post-conviction hearing, Ms. Isom testified that, at an initial meeting with trial counsel, trial counsel asked her if she liked the victim. When Ms. Isom responded that "in the beginning he was okay[,]" trial counsel advised Ms. Isom, "[Y]ou can't like him. If we go to court and I put you up there, you can't like him." However, the Petitioner has failed to explain how he was prejudiced by trial counsel's alleged advice to Ms. Isom. Accordingly, the Petitioner is not entitled to relief on this claim. *See Goad*, 938 S.W.2d at 370.

### 7. Improperly instructed the Petitioner to "cry on cue"

The Petitioner testified at the post-conviction hearing that trial counsel had instructed him to cry at a certain point in his testimony to "add emotional weight" to his story and to help convince the jury that the story was true. The post-conviction court made no specific factual findings regarding this allegation. However, even assuming the truth of the Petitioner's claim, we cannot conclude that trial counsel's instruction was so disruptive or damaging to the Petitioner's testimony that it resulted in prejudice to the Petitioner. Ms. Nassios testified that, although "[t]here may have been points where he got emotional," the Petitioner was "very collected . . . cool, and polite, courteous" while testifying and that he was well-prepared by trial counsel. Accordingly, the Petitioner has failed to establish prejudice resulting from trial counsel's alleged instruction that the Petitioner "cry on cue" during his testimony on direct examination. The Petitioner is not entitled to relief on this ground.

### 8. Fabricated the Petitioner's trial testimony

The Petitioner contends that trial counsel fabricated his trial testimony "so as to create some justification for [the Petitioner's] stabbing [the victim]." At the post-conviction hearing, the Petitioner explained that trial counsel concocted the story about how the victim "was aggressive," made crude statements about the Petitioner's sister, and "got on top of [the Petitioner]." The Petitioner stated that, if he had testified truthfully at trial, he would have said that the victim never said anything to him but that the Petitioner "went into a rage," pulled out his knife, and attacked the victim. However, as noted by the post-conviction court, "[w]ithin hours [of the murder] the [P]etitioner surrendered to law enforcement and provided video and audio taped admissions that he killed [the victim]." The Petitioner told police that the victim "jumped on top of him" during a fight, that the Petitioner "was frightened . . . and that he began 'sticking [the victim] in the stomach' with a stick." *Deadrick Garrett*, 2011 WL 486846, at *2. Thus, it appears

that much of the Petitioner's story had been established long before trial counsel's involvement in the case.

In any event, even under the Petitioner's post-conviction hearing testimony, the Petitioner obtained a knife before traveling to the victim's home, attacked the victim from behind, cut/stabbed the victim twenty-five times, and attempted to conceal his role in the victim's murder thereafter, all facts which would support the Petitioner's conviction for first-degree murder. Thus, the Petitioner has failed to establish a reasonable probability that, but for trial counsel's advice, the result of the proceeding would have been different. *Goad*, 938 S.W.2d at 370. The Petitioner is not entitled to relief on this ground.

### III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE